OPINION
Cedric Powell appeals from his conviction after a jury trial in the Montgomery County Common Pleas Court of rape, kidnaping, two counts of felonious assault, two counts of corruption of a minor (with an age specification), six counts of pandering sexually oriented material involving a minor, and three counts of the illegal use of a minor in a nudity oriented material or performance. Powell was also convicted of four firearm specifications.
The trial court sentenced the defendant to two five year consecutive sentences on the rape and kidnaping charges in counts one and two of the indictment. The trial court imposed two concurrent five year sentences on the defendant for the felonious assault convictions to be served consecutive to the rape and kidnaping convictions. The trial court imposed two twelve month sentences on counts 5 and 6 which were the corruption of a minor counts. The defendant received nine concurrent two year sentences on his convictions of counts 7 through 15 which were the remaining counts in the indictment and which were to be served consecutive to the other counts in the indictment. The trial court merged the firearm specification and imposed a three year actual incarceration consecutive to and prior to the definite terms imposed for a total of twenty years of imprisonment.
The facts underlying this appeal are set out in the State's brief and are supported by our examination of the record. In February of 1998, fifteen-year-old Shannon Trammell went to Time Communications ("the store"), a pager and cellular telephone store located at 1450 W. Third Street in Dayton, to return a pager. At that time Shannon met appellant, the owner of the store. Thereafter, Shannon spent almost everyday at the store, playing on the computer and watching television. Between September 1 and November 30, 1998, Powell took photographs and made a video of Shannon engaging in sexual activity with him and in various stages of nudity. While taking the photos and making the video, Powell told Shannon what to do and how to pose.
On Thursday, February 18, 1999, Shannon received a telephone call from appellant at her home. Powell asked her to watch the store for him while he ran errands. Shannon agreed and Powell picked her up at her house sometime before dinner. As Shannon and Powell drove to the store, Powell questioned Shannon about some money. When Shannon explained to Powell that she did not know anything about any money, Powell slapped her across the face with his hand. Shannon got out of the car and tried to walk away from Powell, but Powell grabbed her by her coat, took hold of her arm, and guided her inside and into the back room of the store.
Once in the bedroom area, Shannon testified that Powell began to hit her with his hands and rip at her clothes. When Shannon tried to fight back, Powell began to kick her, all the while asking about his money and a ring. When Shannon repeated that she did not know what he was talking about, appellant whipped her naked body with an extension cord and beat her with a spindle from a stair banister.
To ensure that Shannon did not escape, Powell handcuffed Shannon's left arm to the bed and tied her right arm to the bed with the extension cord. Powell placed a blue blanket over Shannon's head and stated, "bitch, I'm about to kill you." Shannon was able to pull the blanket down from her eyes with her arms and observed Powell pull out a gun. Powell put the barrel of the gun in Shannon's mouth, then took the gun out of her mouth, pointed it at her, and fired. Shannon testified she felt the bullet fly by her head and then felt the hard metal surface of the gun make contact with her head just behind her left ear.
As Shannon attempted to recover from the blow to her head, Powell poured gasoline over her. The gasoline drenched the coat that was still hanging from Shannon's arm and ran into her mouth and eyes. Shannon spent Thursday night with her left wrist handcuffed to the bed. Shannon next saw Powell on Friday, February 19, 1999. Powell entered the bedroom, flipped Shannon over on her stomach, bent her upper body over the bed, and penetrated her anally with his penis. Shannon begged Powell to stop, but he continued to rape her for five to ten minutes more.
Meanwhile, Gloria Trammell began to look for her daughter, Shannon, when she had not returned home in over a day. At approximately 11:30 a.m. on Saturday, February 20, 1999, Mrs. Trammell and Quincy Trammell, Shannon's cousin, went to appellant's store. Mrs. Trammell informed Powell that she was looking for Shannon, but Powell stated that he had not seen her.
At the same time, Shannon heard her mother's voice. Shannon called out her mother's name, "Gloria." Quincy heard someone cry out from the back of the store and recognized the voice as Shannon's. Mrs. Trammell noticed that Powell became nervous and fidgety and spoke louder to drown out Shannon's cries. Based on Powell's suspicious behavior, Mrs. Trammell told Powell that she was calling the police, and she and Quincy left the store. Powell went into the bedroom and told Shannon that if she did not "shut up," he would kill her. Powell then ordered Shannon into the closet, warned her to be quiet and closed the door.
Powell, Shannon, and another woman, later identified as Jquan McDade, exited the store through the back door. Thereafter, Shannon was permitted to call her grandmother from a payphone on the corner of Westwood and Hoover, under Ms. McDade's close observation. At the same time, Mrs. Trammell and Quincy were driving down Hoover Avenue and saw Shannon standing at the payphone with Ms. McDade. Quincy immediately jumped out of the car and ran over to Shannon. Quincy grabbed Shannon's right arm and pushed Ms. McDade out of the way, who was holding onto Shannon's left arm. Ms. McDade threw up her hands and said, "well, it's her life." Mrs. Trammell subsequently took Shannon to Good Samaritan Hospital.
Dr. Rebecca Perry of Good Samaritan Hospital testified that, on Saturday, February 20, 1999, Shannon had generous amounts of bruising to her face, bruising caused by blunt trauma behind Shannon's left ear, abrasions to the back portion of her neck, linear bruising to her inner thighs, abrasions to her left wrist, and loop-like linear bruising to her back which were consistent with being whipped with an electrical cord. Nurse Kathryn Black testified that Shannon's clothes smelled strongly of gasoline.
Detective David Wolford of the Dayton Police Department testified at trial that he was dispatched on December 17, 1998 to the Rite-Aid Pharmacy on Third and James H. McGee in Dayton on a report that the pharmacy had developed photos of naked juvenile females with an adult male. Wolford said he went to the pharmacy and viewed the photographs which were identified in the trial record as State's Exhibits 2-11. The film was left by a person who identified himself as Earl Martin. Wolford said he turned the photos over to Detective Claudette Ison and later participated in the search of Powell's business. It was then that Wolford learned of the identity of the persons in the photographs, Powell and Shannon Trammell.
Earl Martin testified he was a friend of Cedric Powell and often helped him out at Powell's business. Martin said he saw Powell photographing Shannon Trammell. He said Powell used a timer so that he could be photographed with Shannon. Martin said he was also present with Shannon. Martin said he was also present when the videotape was made.
Martin said he was at the store when Shannon came to the defendant's business on Thursday evening, February 18, 1999. At that time Martin said Shannon looked normal. Martin said when he returned the next morning Shannon was handcuffed to a bed. Martin said Shannon's face was "messed up," that her eye was black and swollen shut, and her mouth was busted. Martin said Shannon was wearing torn pants and no shirt. Martin said he then mopped up gasoline which was on the floor of the room where Shannon was located. Martin said Powell told him the next day that he had anal sex with Shannon.
Dayton police officers arrested Powell later that evening. Powell admitted to Dayton Detective William Lawson that he had known Shannon Trammell for about two years and that he had sexual intercourse with her on numerous occasions. He denied having sexual relations in the month preceding his arrest. He admitted knowing that Shannon was a teenager.
Powell stated he suspected Shannon of stealing a diamond ring from him in December 1998 but he couldn't prove it. Powell stated to the police that on February 15, 1999 while Shannon was at the store someone stole $175 from his coat. Powell said Shannon did not come to the store for a few days. Powell said he then called Shannon and asked to talk to her. Powell said he went to Shannon's home and took her to the store and confronted her about the thefts. Powell said he became angry when Shannon denied responsibility and he "smacked her in the face with his hand."
Lawson testified that Powell told him that Shannon admitted stealing the ring and the money. Shannon told him she gave the ring to her boyfriend, Victor, and used the money herself to buy crack. Lawson said Powell told him he told Shannon she wasn't leaving the store until he got his jewelry back. Powell said Shannon stayed at the store until Saturday February 20, 1999.
Powell denied raping or kidnaping Shannon and stated that Shannon already had injuries when he picked her up at her home. Powell said he thought Shannon's boyfriend Victor had injured her.
After interviewing Shannon and the defendant, Detective Lawson obtained a search warrant for Powell's business premises. Lawson stated the following facts in an affidavit in support of the warrant:
 On February 18, 1999 in the evening hours, the complainant, Shannon Trammell, was kidnaped in the 600 block of Brooklyn Ave. by a Cedric Powell. Powell kidnaped Trammell over the allegation that she stole Powell's ring. Powell took Trammell to his business at 1450 W. Third St. at that location Trammell was repeatedly raped and beaten by Powell. Powell tied Trammell to a bed with an extension cord. He put a handgun in her mouth and to her forehead. Powell beat her with a tire rim, piece of wood, extension cord. While being held captive Trammell had to use a pot to urinate in.
Lawson stated the following items were used in the commission of the offenses or were evidence of the offenses and the trial court issued the search warrant to the police to search for these items:
 Extension cord, black/white striped bed spread, blue sheet, unknown types of firearms, bullets, fake finger nails, gasoline can or any type of container containing gas, hand cuffs, piece of wood from a bannister, tire rim or wheel, pot (used as urinating in).
Dayton police searched Powell's business and recovered several firearms and bullets, a spent 9 mm cartridge, fake fingernails, a wood bannister, an extension cord, two used condoms, two tire rims, a mop saturated with gasoline, black sweat pants, and a Sharp 8 mm camcorder. (See Defendant's Exh. A, Inventory and Receipt).
During the search, the Sharp camcorder was seized despite the fact it was not listed in the search warrant as an item to be seized by the police during the search. The camcorder which was inside a carrying case was seized from under a desk located in the front of the business.
Detective Lawson explained at the suppression hearing that the camcorder was seized because officers had discovered numerous Polaroids of naked girls and he thought the camcorder and the tape inside it might show Powell having sexual relations with Shannon Trammell. Lawson said the camcorder was seized on a hunch it might reveal damaging evidence.
Lawson admitted that he had no evidence from the victim that she was being photographed or videotaped during the sexual activity. Lawson stated the Polaroid photographs were left on the scene because it could not be determined if any of the women photographed were juveniles. On redirect examination, Lawson stated he seized the camcorder because he thought there may be something on the camcorder.
Detective Claudette Ison, a Dayton police officer with 25 and one half years of experience (sixteen years on the Sexual Assault Squad) testified she went to the hospital and interviewed Shannon Trammell. She stated Ms. Trammell was bruised from "the neck down to the bottom of her feet."
Detective Ison testified she was present when the Polaroid photographs were discovered in a drawer in a back room of the business. She said the photos depicted naked adult women in provocative poses. Detective Ison then testified as follows:
BY MS. FRIDAY-BROWN:
 Q. Okay. Uh . . . when you saw those fifteen to twenty photos of nude women exposing themselves, did that cause any concern for you as it relates to this case?
A. Yes, it did.
Q. What was that?
 A. It was my belief that there was a possibility that we would find pictures or something — video pictures or something to that fact of Shannon, had we continued to look.
 And just as I was looking, uh . . . Detective Daily, uh . . . said: "Is on, you need to come in here and look at this." And I go in and the camcorder is on, and while it's runnin' I see, uh . . . Shannon . . .
Q. The victim?
 A. . . . and I said: "That is my victim, Shannon Trammell in there."
Prior to trial, Powell moved to suppress the admission of the videotape. The trial court found that the seizure by the police of the camcorder and the videotape found therein was reasonable because it was seen by the police officers in "plain view." The trial court found that the officers had more than probable cause to believe the camcorder may contain other incriminating evidence. Curiously, the trial court then found the seizure was "pursuant to a valid search warrant and that it did not exceed the scope of that warrant." (See Decision dated June 2, 1999).
The Fourth Amendment specifically commands that no warrants shall issue except those particularly describing the things to be seized. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Marron v. United States (1927), 275 U.S. 192, 196. "[T]he warrant must be sufficiently definite so that the officer executing it can identify the property sought with reasonable certainty." State v.Muldowney (1972), 292 A.2d 26, 29. "[T]he key inquiry is whether the warrants could reasonably have described the items more precisely than they did." State v. Benner (1988), 40 Ohio St.3d 301, 307.
A third purpose underlying the particularity requirement is to prevent the issuance of warrants on loose, vague, or doubtful bases of fact.Go-Bart Importing Co. v. United States (1931), 282 U.S. 344, 357. The requirement of particularity is closely tied to the requirement of probable cause. State v. Perrone (1992), 834 P.2d 611, 616. It must be probable that the described items are connected with criminal activity and that they are to be found in the place to be searched. The less precise the description of the things to be seized, the more likely it will be that either or both of these probabilities has not been established. See cases cited in Search and Seizure, LaFave, (3d Ed.) at Sec. 4.6(A) pp. 552-553.
The greatest care in description is required when the consequences of a seizure of innocent articles by mistake is most substantial as when objects to be seized are books or films. United States v. Marti (2nd Cir. 1970), 421 F.2d 1263, 1268.
A warrant with an insufficient description may not be rehabilitated by showing that the executing officer was aware of other facts which enabled him to know exactly what things were intended to be covered, or that the officer for that reason or by luck may seize the items which an adequate description would have covered. United States v. Abrams (1st Cir. 1980),615 F.2d 541 544; United States v. Marti, supra.
"[O]bjects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Harris v. United States (1968), 390 U.S. 234,236. The plain view doctrine comes into play when a police officer discovers evidence while in the course of a search for other evidence.Texas v. Brown (1983), 460 U.S. 730, 738.
The intrusion affording the plain view must be lawful and the incriminating nature of the evidence must be immediately apparent to the seizing authority. Horton v. California (1990), 496 U.S. 128, 136.
The police officer need not know that the items in plain view are contraband or evidence of a crime. It is sufficient that probable cause exist to associate the property with criminal activity before evidence may be seized under the plain view doctrine. Arizona v. Hicks (1987),480 U.S. 321, 326.
In Arizona v. Hicks, supra, the U.S. Supreme Court held that a police officer properly searching for one who fired a shot in a building, for victims and for weapons, may not under the plain view doctrine move stereo components which they only suspected of being stolen, in order to read and record serial numbers. The Court held that this constituted an intrusion not justified by the urgency authorizing the entry. The Court held that the "immediately apparent" requirement of the plain view doctrine to authorize seizure requires probable cause. Reasonable suspicion is not enough.
In State v. Mitchell (November 9, 1988), Ross App. No. 1467, Cunreported, while police were executing a search warrant for "controlled substances and illegally possessed dangerous ordnances, and any other items criminally possessed," they discovered unlabeled films that the police inventoried and viewed and that led to sexual pandering charges. The Ross County Court of Appeals affirmed the trial court's granting of the motion to suppress because it was not immediately apparent that the unmarked video tapes were associated with criminal activity. The court noted that "[i]n order to determine the incriminating nature of those tapes, the officers had to seize and then view them." Id. at p. 2.
The search warrant did not authorize the seizure of the camcorder and the videotape contained therein. The camcorder and tape could not be seized pursuant to the "plain view" doctrine. It was not immediately apparent to the police officers that the videotape which was inside a camcorder inside a carrying case contained evidence associated with the alleged rape and kidnaping of Shannon Trammell. There was no indication in the affidavit for the search warrant or even in the evidence provided at the suppression hearing that Shannon had told Detective Ison that she had been photographed or videotaped during the alleged crimes. In short, there was no probable cause present during the search that the camcorder contained evidence related to the crimes being investigated. At best the officers possessed merely suspicion that the camcorder and tape would provide additional evidence of Powell's guilt. The first assignment of error is Sustained.
In his second assignment, Powell contends the trial court erred in failing to sever counts one through four from the remaining counts in the indictment, Counts 5-18. The first four counts allege the defendant committed the crime of rape, kidnaping, and two counts of felonious assault. These counts portray events occurring between February 18-20, 1999. The remaining counts relate to graphic sexually-oriented materials that were produced with Shannon Trammell's cooperation between September 1, 1998 and November 30, 1998.
Powell contends the trial court should have granted his severance motion because the State's evidence that the defendant photographed and filmed Shannon Trammell engaging in lewd and obscene behavior could forseeably inflame the jury and impair their ability to render an impartial verdict on the first four counts in the indictment.
Powell argues that the videotape was created under far different circumstances and with a different motivation than was allegedly present in the counts alleging assaultive conduct. Powell notes that Shannon Trammell admitted that she engaged making the video and helped create it.
The State argues that joinder of all the counts in the indictment was proper as the counts all involved the same victim and the latter counts formed the background and provided the jury with a motive for counts one through four; i.e. his desire to dominate and manipulate Shannon Trammell. The State also argues that the defendant cannot demonstrate how he was prejudiced since the evidence as to each group of charges was simple and direct.
Pursuant to Crim.R. 8(A), joinder of multiple offenses is permitted when the charged offenses are "of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." As a general rule, joinder of offenses is favored to prevent successive trials, to minimize the possibility of incongruous results in successive trials before different juries, to conserve judicial resources, and to diminish inconvenience to the witnesses. State v. Torres (1981), 66 Ohio St.2d 340,343, 20 O.O.3d 313, 421 N.E.2d 1288.
If offenses are properly joined, as in the instant case, a defendant may move to sever under Crim.R. 14. A defendant claiming error in the joinder of multiple counts in a single trial must make an affirmative showing that his rights were prejudiced. Torres, supra at 343. A defendant cannot demonstrate prejudice where evidence of each of the offenses joined at trial is simple and direct. State v. Franklin (1991),62 Ohio St.3d 118, 122, 580 N.E.2d 1. Where the evidence is uncomplicated, the jury is believed capable of segregating the proof on multiple charges. Torres, supra.
We agree with the State that the evidence related to all counts was simple and direct. The jury was not likely to become confused about the separate allegations in the indictment. The jury might believe that defendant engaged in consensual sexual conduct with the juvenile but not non-consensual conduct such as rape, kidnaping, and assault. For an appellate court to reverse a trial court ruling that denies severance, the accused must show that the trial court abused its discretion. State v.Franklin, supra, at 122. We find no abuse of discretion on the state of this record. The second assignment of error is overruled.
In his third assignment, appellant contends the trial court erred in permitting evidence to be admitted in violation of the rape shield statute and in violation of Evid.R. 402, 403, and 404 and in failing to grant a mistrial.
Specifically, Powell objects to the State's introduction of a videotape depicting him engaged in sexual activity with Ayesha Walker, an adult, in violation of the rape shield statute, R.C. 2907.02(D). That statute provides as follows:
 Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59
of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.
We agree with the appellant that the trial court should not have admitted that portion of the video depicting his sexual activity with an adult. We agree with the State that the prejudicial effect of its admission was minimal since Ms. Walker appears nude in only a small portion of the video and that her presence in the video was not to be considered as evidence of appellant's guilt in the charged offenses.
We fail to see how the admission of the videotape influenced the jury in their finding the defendant guilty of counts 13-18 which charge the defendant with photographing Shannon Trammell, a minor, in the state of nudity. The photographs labeled State's Exhibit 10 and 11 adequately depict the violation of those counts in the indictment.
Powell claims the trial court erred in permitting the prosecution to ask defense witness Jimmie Christon if the bulk of his cases were criminal cases and if he represented Powell before February 18, 1999. Powell claims this left the inference that he is a criminal who merely acted in conformity with his criminal character in relation to the charges in the indictment.
The State argues that the evidence was more innocuous. The State points out that Mr. Christon testified he was at the appellant's store "on business with his client" on February 19, 1999, and he did not testify he was representing the defendant on a criminal matter.
We agree with the State's view of the evidence. The prosecutor's question was inappropriate and dangerous but not prejudicial.
Lastly, appellant contends the trial court erred in not granting a mistrial when the prosecutor asked Jquan McDade if she ever had sex with the appellant and she replied in the affirmative. Ms. McDade is an adult. Defense counsel then moved for a mistrial because the evidence violated R.C. 2907.02(D). The trial court overruled the mistrial motion stating:
 The Court is fully confident that a limiting instruction will cure this error, and I want to say that this was not done in the sense of bringing the evidence in an uncharged offense against [Appellant].
 There's no suggestion that this sexual activity the witness had with [Appellant] was criminal activity. It was elicited in the context of how it is [Appellant] and she were acquainted and the degree of their acquaintance, so I fail to see the prejudice, first of all, by the introduction of this testimony even though perhaps technically it was in violation of the rape shield statute.
(Tr. 1574). Indeed, the court struck Ms. McDade's testimony from the record and immediately instructed the jury to "totally disregard [the State's] question and [Ms. McDade's] answer and not consider it for any purpose whatsoever in your ultimate decisions in this case." (Tr. 1575).
The decision to grant a mistrial is committed to the sound discretion of the trial court. There was no abuse present in the court's ruling to deny the motion. The third assignment of error is overruled.
Powell argues in his fourth and sixth assignments of error that he received ineffective assistance of counsel at his trial. Specifically, he asserts that his counsel was deficient when he did not sufficiently familiarize himself with DNA so that he could effectively cross-examine the State's expert witness; challenge the DNA evidence concerning blood found on Powell's bedsheets; challenge possible contamination of items tested for DNA; challenge the statistical foundation for the expert's DNA findings; and renew the motion for severance at the end of the State's case.
To prevail on a claim of ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. Stricklandv. Washington (1984), 466 U.S. 668, 687. To demonstrate deficiency, a defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. at 688. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Id. The adequacy of counsel's performance is reviewed in light of all the circumstances surrounding the trial. Id.
"Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." State v. Cook
(1992), 65 Ohio St.3d 516, 524-25. Assuming that counsel's performance was ineffective, the defendant must still show that the error had an effect on the judgment. State v. Bradley (1989), 42 Ohio St.3d 136, 142. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id.
Prior to the testimony of Annette Davis of Miami Valley Regional Crime Lab, Powell's counsel explained:
 * * * I have conversed with [Appellant] regarding this matter, and at this time, we will forgo having anyone sit with me for cross-examination of this witness.
 The reasons for that, for the record, is simply because there has already been testimony by way of statements my client made and by way of statements of the witness Shannon Trammell that they had, in fact, engaged in sexual intercourse on many occasions, or I think the phrase was numerous occasions, prior to the alleged incident in question.
 Accordingly, the finding of a condom with his semen inside and her DNA outside, the finding of semen on the bed in question and perhaps some other DNA in question from her on that same bed will not, in our opinion, be challenged by us. It will be representative of exactly what the evidence tends to show and which we are not refuting.
 Therefore, the procedural elements of DNA testimony we will not challenge. We do expect that the testimony will not be able to reveal when that DNA sample was made or anything of that nature in terms of tying it to a specific incident on February the 18th, 19th, or 20th.
(Tr. 1390-91).
As counsel represented, Powell admitted to having sexual relations with Shannon Trammell in the past. The seizure of a condom from the store having Powell's DNA on the inside and Shannon's DNA on the outside would not be uncommon given both parties' admissions. Furthermore, counsel elicited testimony from Ms. Davis that she could not determine when the DNA sample from the condom was created. Although Ms. Davis agreed that the discovery of DNA on the condom indicated that Shannon and Appellant had sex, the presence of DNA could not indicate when they had sex. Counsel's emphasis on the moldy condition of the condom was based on the same trial strategy, i.e., the theory that the condom was used prior to February 18, 1999., Appellant also argues that his counsel was deficient when he "agreed not to challenge whether any of the DNA-related items were contaminated." It appears that Appellant is referring to the moldy condition of the condom when it was received by Ms. Davis. However, a close reading of the transcript reveals that counsel's stipulation concerning contamination was not to the condition of the condom, but to the items used by Ms. Davis to extract blood and secretions from the condom, sheets and blue blanket, i.e., cotton-tipped swabs., Appellant further posits that his counsel was ineffective when he failed to "challenge the statistical foundation for the DNA findings." Appellant's argument is based on Ms. Davis' reliance on statistics generated by the FBI to arrive at her conclusion. Appellant asserts that Ms. Davis' opinion was inadmissible because it was based on unauthenticated, inadmissible statistics.
Evid.R. 703 states that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." The Supreme Court emphasized the disjunctive language of Evid.R. 703 when it explained that, "where an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied." State v. Solomon (1991), 59 Ohio St.3d 124, 126.
In State v. Breeze (November 24, 1992), Franklin App. No. 92AP-258, unreported, the court held that a DNA expert's opinion was admissible under Evid.R. 703 even though the expert's opinion was based on population statistics published by the FBI. The court stated:
 [A]n expert necessarily brings to each case knowledge of facts or data which are not in evidence, for it is this knowledge which qualifies a witness as an expert. Thus, to the extent that the expert applies to the facts in evidence scientific principles, theories, calculations, measurements, or tables — which have qualified the witness as an expert — such principles, theories, calculations, measurements, or tables need not be in evidence if the predicate facts are in evidence.
Id., at 3 (quoting State v. Minor (1988), 47 Ohio App.3d 22,546 N.E.2d 1343) syllabus. Although the expert in Breeze, supra, did not compile the population statistics upon which she relied, "she used them with such frequency that they became part of the body of knowledge that qualified her as an expert." Breeze, supra at 3. The expert's testimony was otherwise based on her own observations and, therefore, met the requirements of Evid.R. 703. Id. See, also, State v. Stokes (Dec. 11, 1997), Cuyahoga App. No. 71654, unreported at 7.
Likewise, in the instant case, Ms. Davis personally conducted DNA analysis of secretions found on the condom, the bedsheets, and the blue blanket. (Tr. 1403-04). Although she used population statistics to arrive at her conclusion, her testimony was based on her own observations and was, therefore, admissible. As such, counsel's failure to challenge the statistical foundation for the DNA findings does not constitute ineffective assistance of counsel.
The fourth and sixth assignments of error are both overruled.
In his fifth assignment of error, Powell contends he was denied by the State of the due process of law guaranteed him by the Fourteenth Amendment. He contends that the employment of improper preservation techniques with respect to the condom admitted in evidence may be characterized as gross negligence. Powell claims the evidence indicated uncertainty when the mold formed on the condom and an improper inference may have been drawn by the jury that police laboratory contaminated the sample through its improper preservation, when the specimen was actually contaminated before its seizure by police.
The State argues that this assignment should be overruled because the appellant failed to demonstrate that the State of Ohio acted in bad faith. We agree.
The State's constitutional duty to preserve evidence is limited to evidence that might be expected to play a significant role in a defendant's defense. California v. Trombetta (1984), 467 U.S. 479, 488. For the duty to preserve evidence to arise, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489.
A different result is warranted, however, where the evidence is only potentially exculpatory. Arizona v. Youngblood (1988), 488 U.S. 51, 57. The failure to preserve potentially useful evidence does not constitute a denial of due process of law unless a criminal defendant can demonstrate bad faith. Id. at 58.
Bad faith occurs in situations in which "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Id. The existence of bad faith may also be found where the evidence is destroyed in a calculated effort to circumvent the disclosure requirements set forth in Brady v. Maryland (1963), 373 U.S. 83. The fifth assignment of error is overruled.
In his seventh assignment, Powell contends he was denied a fair trial when the State failed to provide him with the prosecutor's summary of her interview with witness, Earl Martin. Martin testified that Powell told him he had anal sex with Shannon Trammell.
Powell contends that the presentation of his defense and the outcome of his case could reasonably have been adversely affected as a result of the prosecutor's failure to provide this discovery material to him. (Brief at page 20).
The prosecutor explained that Martin's statement was contained in her own notes, taken during a pre-trial interview with Mr. Martin in preparation for trial. The trial court found that Powell was not entitled to a copy of the prosecutor's notes pursuant to Crim.R. 16(B)(2). The court noted that Powell would be entitled to view the notes only if they reflected an inconsistency with Mr. Martin's testimony. The prosecutor reviewed her notes in the presence of the court and defense counsel and informed the court that no inconsistency existed. The court then placed a copy of the notes in a sealed envelope for review by this Court. Id.
The State argues the trial court properly did not allow Appellant to view the prosecutor's notes in this case because the notes clearly fall into the category of documents enumerated in Crim.R. 16(B)(2).
Crim.R. 16(B)(2) exempts from disclosure "reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents." Crim.R. 16(B)(1)(g) requires disclosure of prior statements of a witness contained in such documents only if any inconsistencies exist between the testimony of the witness and his prior statement.
The prosecutor had no duty to disclose the contents of notes taken during Martin's interview because the notes do not constitute "statements," as that term has been defined by Ohio courts. State v.Jenkins (1984), 15 Ohio St.3d 164, 225. See, State v. Moore (1991),74 Ohio App.3d 334, 340-41 ("statement" exists where witness prepared, signed or adopted statement or is a continuous, narrative statement made by the witness and recorded verbatim); State v. Henry (1987),37 Ohio App.3d 3, 8; State v. Washington (1978), 56 Ohio App.2d 129, 133, 10 O.O.3d 150. Martin testified that he did not read what the prosecutor wrote in her notes during the interview and, therefore, did not approve the statement or adopt it as his own. Additionally, the notes do not contain a continuous, narrative statement by Mr. Martin, such that it would constitute a "statement" subject to disclosure.
We have examined the notes of the prosecutor's pre-trial interview with Martin. (Court's Ex. 1). The notes reflect that Martin testified consistent with his pre-trial conversation with the prosecuting attorney. The trial court properly determined the prosecutor's notes were not discoverable pursuant to Crim.R. 16. The seventh assignment of error is overruled., Appellant contends in his eighth assignment that the evidence was insufficient to support his conviction on counts 5-15 in the indictment. The State charged Powell with corruption of a minor in violation of R.C. 2907.04(A) in counts 4 and 5. The jury found the defendant guilty in count five of the violation "as depicted in State's Exhibits 2 and 5." A reasonable juror could have concluded that Shannon Trammell was holding the defendant's penis to her mouth in the photograph labeled State's Exhibit 2.
Corruption of a minor requires that an adult engage in sexual conduct with a person 13 years or older and less than 16 years of age. Shannon Trammell was 15 years of age at the time of the offense and the defendant was an adult. Sexual conduct includes "fellatio." R.C. 2907.01. Fellatio is committed by touching the male sex organ with any part of the mouth.State v. Long (1989), 64 Ohio App.3d 615, 618.
 In Count Six, the jury found the defendant guilty of corruption of a minor "as depicted on Exhibit 22" which is the video which was improperly admitted into evidence. The defendant's conviction in Count Six was improper and will be vacated.
Powell was convicted of pandering sexually oriented material in counts 7 through 12. These counts refer explicitly to the photographs identified as State's Exhibit's 2 through 6 and State's Exhibit 22, the videotape.
R.C. 2907.322(A)(1) provides:
 (A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:
 (1) Create, record, photograph, film, develop, reproduce, or publish any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality;
(Emphasis ours).
Sexual activity includes "sexual contact" which means the touching of an erogenous zone of another. The photographs taken by the defendant or under his direction depict Shannon Trammel touching the defendant's penis. There is evidence in the record to support Powell's conviction on Counts 7-11. Count 12 will be vacated as it relies on the videotape to sustain the verdict.
Counts thirteen through fifteen charge Appellant with illegal use of a minor in nudity-oriented material or performance, in violation of R.C.2907.323(A)(1), which requires that the offender photograph or direct the performance of a minor in a state of nudity. Nudity is defined as "the showing, representation, or depiction of human male or female genitals, pubic area, or buttocks with less than a full, opaque covering, or of a female breast with less than a full, opaque covering of any portion thereof below the top of the nipple[.] * * *" R.C. 2907.01(H). A violation of R.C. 2907.323(A)(1) occurs where there is a lewd exhibition of nudity or a graphic focus on the genitals. State v. Young (1988),37 Ohio St.3d 249, paragraph one of the syllabus, 525 N.E.2d 1363, reversed on other grounds, Osborn v. Ohio (1990), 495 U.S. 103.
In overruling the Crim.R. 29 motion to counts thirteen through fifteen, the trial court explained:
 * * *[T]he Court has no difficulty with regard to the videotape depicting nudity as defined by this Court and concluding a reasonable finder of fact could view in that videotape a lewd exhibition of nudity.
 With regard to the photographs, * * * the Court believes that reasonable minds could at least disagree as to whether Exhibits 10 and 11 constitute a lewd exhibition of nudity. There is nudity depicted by Shannon Trammell, that is, her buttocks are exposed, and that's certainly within the definition of nudity, and both exhibits show Miss Trammell raising her buttocks directly into the camera.
 A reasonable mind could view that as a lewd exhibition of her buttocks that is intended to appeal to the prurient interest of the person viewing those photographs[.] * * *
(Tr. 1825-26).
The jury found the defendant guilty of Count 13 based on State's Exhibit 10, Count 14 on State's Exhibit 11. We have examined these photographs and find they support the jury's verdict on those counts. Count 15 relies specifically on the videotape and the conviction on that count must be vacated because the tape was improperly seized. The appellant's eighth assignment of error is sustained in part.
In his ninth assignment, appellant contends that he was deprived of a fair trial because of prosecutorial conduct in opening and closing argument., Appellant specifically argued the following in his brief:
 During its opening argument, the State referred to "these horrific crimes" and "this horrific crime." (Tr. 35, 36). During its closing argument, the State misstated evidence, referring to "two and a half days of torture . . . about sixty hours continuously, nonstop. (Tr. 2182).
The state additionally invited the jury to imagine what the complainant went through at the Appellant's place of business "where he kept her kidnaped, he raped her, he beat her, he did everything imaginable — unimaginable actually. Everything that you don't do to a human being, this man did." (Tr. 2182).
An attack against the defense attorney in argument is also impermissible. See State v. Keenan, 66 Ohio St.3d 402. However, the state remarked in closing, "I find it interesting that in closing arguments, Mr. Smiley prefaced this closing argument with "I'm not going to intentionally misstate what was testified to here." (Tr. 2186)., Appellant maintains that the fairness of his trial was tainted through the cumulative effect of these remarks.
The prosecution is entitled to a certain degree of latitude in its remarks to the jury during opening statement and closing argument. Statev. Woodards (1966), 6 Ohio St.2d 14, 26. The test is whether the remarks were improper and if so whether they prejudicially affected the substantial rights of the defendant. State v. Smith (1984),14 Ohio St.3d 13, 14.
No objection was made to the prosecutor's initial remarks referred to in the record at pages 2182 and 2186. If counsel thought the prosecutor misstated the record, counsel should have objected and the court could have corrected the prosecutor in the jury's presence. The prosecutor's remarks about the crimes charges were reasonable inferences the jury could have drawn from the evidence. Failure to object to allegedly improper statements during closing arguments waives all but plain error.State v. Ballew (1996), 76 Ohio St.3d 244, 254. The ninth assignment of error is overruled.
In his tenth assignment Powell asserts that he was denied a fair trial because the prosecutor inappropriately asked Attorney Jimmie Christon if the bulk of his cases were criminal cases and if he represented the defendant before February 1999. While we agreed with Powell that counsel should have avoided this line of inquiry due to its potential for prejudice, we cannot say the defendant was denied a fair trial due to the prosecutor's line of questioning. The prosecutor appropriately pointed out that Powell and Christon were close friends for the purpose of impeaching Christon's credibility. The tenth assignment is overruled.
In his eleventh assignment, Powell claims cumulative error at the trial denied him a fair trial. The only significant error was the admission of the videotape but its admission by the trial court does not require a finding that the defendant was denied a fair trial. This assignment is also overruled.
In his twelfth assignment, appellant contends the trial court should have granted his post-trial motion to merge his felonious assault convictions, his corruption of minor conviction with his pandering conviction, his kidnaping conviction with his felonious assault convictions, and the firearm specification attached to counts one through four.
The State argues that none of the offenses constituted allied offenses of a similar import and the trial court did merge the firearm specification in sentencing the defendant.
The Ohio Supreme Court has set out a two-step test to determine when convictions may be obtained for two or more allied offenses of similar import. In the first step, the elements of the offenses at issue are compared in the abstract to determine whether the elements correspond to such a degree that the commission of one offense will result in the commission of the other. State v. Rance (1999), 85 Ohio St.3d 632, 638,710 N.E.2d 699. Notwithstanding the fact that offenses constitute allied offenses of similar import under the first step, a defendant may be convicted of both offenses if his conduct demonstrates the offenses were committed separately, or with a separate animus as to each. State v.Logan (1979), 60 Ohio St.2d 126, 129, 14 O.O.3d 373, 397 N.E.2d 1345. It is the defendant's burden to show that the prosecution has relied upon the same conduct to support both offenses. Id. at 128.Powell argues that the two counts of felonious assault, as set forth in counts three and four, should merge. A comparison of the elements of both offenses demonstrates that they are not allied offenses of similar import. R.C.2903.11(A)(1) (count four) requires that the defendant cause serious
physical harm. R.C. 2903.11(A)(2) (count three) requires that the defendant cause or attempt to cause only physical harm. Additionally, the use of a deadly weapon or dangerous ordnance is a crucial element in R.C. 2903.11(A)(2), which need not be present for violation of R.C.2903.11(A)(1).
The elements of kidnaping and felonious assault do not correspond to such a degree that the commission of one necessarily results in the commission of the other. State v. Blankenship (1988), 38 Ohio St.3d 116,118. Furthermore, the kidnaping continued for one and one half days after the assaults were completed. The trial court properly merged the firearm specifications. Accordingly, the twelfth assignment of error is overruled., Defendant's convictions upon Counts 6, 12, and 15 are hereby ordered Reversed and Vacated. The judgment of the trial court is thusReversed in part, modified in part, and as modified the judgment isAffirmed.
 __________________ BROGAN, J.
WOLFF, J., and YOUNG, J., concur.